36 A.3d 449

COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO

v.

PUBLIC SERVICE COMMISSION OF MARYLAND,
Verizon Maryland, Inc.

No. 39, Sept. Term, 2011.

Court of Appeals of Maryland.

Jan. 25, 2012.

Vincent Trivelli (The Law Office of Vincent Trivelli, PLLC, Morgantown, WV; Angela Blythe, Oakland, MD), on brief, for Appellant.

Joseph M. English, Assistant General Counsel (Public Service Commission of Maryland, Baltimore, MD), on brief, for Appellee.

Jeffrey A. Rackow (Gregory M. Romano of Verizon, Baltimore, MD), on brief, for Appellee.

Argued before BELL, C.J., HARRELL, GREENE, ADKINS, BARBERA, JOHN C. ELDRIDGE (retired, specially assigned) and LAWRENCE F. RODOWSKY (retired, specially assigned), JJ.

RODOWSKY, J.

The appellant, the Communications Workers of America, AFL–CIO (CWA or, the Union), appeals the affirmance by the Circuit Court for Baltimore City of Order 83137 of the Public Service Commission (PSC or the Commission), one of the appellees, which approved, pursuant to Maryland Code (1998, 2008 Repl.Vol.), § 4–301 of the Public Utility Companies Arti-

cle (PUC), an alternative form of regulation (AFOR) for Verizon Maryland (Verizon), the other appellee.[1]

PUC § 4–301 provides, in relevant part:

"(a) *In general.*—Notwithstanding § 4–101 of this title or any other law to the contrary, the Commission may regulate a telephone company through alternative forms of regulation.

"(b) *Required findings.*—The Commission may adopt an alternative form of regulation under this section if the Commission finds, after notice and hearing, that the alternative form of regulation:

"(1) protects consumers by, at a minimum:

"(i) producing affordable and reasonably priced basic local exchange service, as defined by the Commission; and

"(ii) ensuring the quality, availability, and reliability of telecommunications services throughout the State;

"(2) encourages the development of competition; and

"(3) is in the public interest."

CWA presents the following issues for our consideration:

"1. Is the Commission's Order 83137 supported by substantial evidence in the record?;

"2. Is the Commission's Order 83137 affected by an error of law in that it [o]rders Verizon to implement a new Alternative Form of Regulation (AFOR) that does not protect consumers by ensuring the quality, availability and reliability of telecommunications services throughout the State of Maryland? ...;

"3. Is the Commission's Order 83137 affected by an error of law in that[,] in [o]rdering Verizon to implement a new AFOR, the Commission made no finding that the new

---

1. As used in this opinion, "Verizon" includes its numerous affiliates who joined in the Petition for Approval of Offer of Settlement that underlies Order 83137.

AFOR protects consumers by producing affordable and reasonably priced basic local exchange service?; [2]

"4. Is the Commission's Order 83137 affected by an error of law in that it [o]rders Verizon to implement a new AFOR that is not in the public interest?; [3] [and]

"5. Is the Commission's Order 83137 affected by an error of law in that it establishes a new balancing of the interest test by its approval of the AFOR?"

For the reasons set forth below, we affirm the judgment of the circuit court.

### The Facts and Procedural History

In December of 2008, Verizon, joined by PSC staff and the Office of the People's Counsel, submitted to the Commission a Joint Petition for Approval of Settlement Agreement to settle six cases then pending before PSC. In January of 2009, CWA, representing approximately 5,000 Verizon employees, petitioned to intervene in the settlement discussion and in PSC's investigation into the quality of Verizon's service to customers. Intervention was granted in February of 2009, conditioned on CWA's acceptance of the written testimony in the record filed by other parties, because deadlines established by PSC for filing testimony had passed. The Commission held a hearing on the first petition to settle on February 12 and 13 of 2009. Then, on April 6, 2009, the Commission rejected the settlement proposed in the December 2008 petition, but stated that it would permit a modification and resubmission of the proposal. See PSC Order 82584. On August 28, 2009, Verizon submitted its second petition to settle the six pending cases. Hearings were held on November 3 and 4, 2009. By Order 83137, the Commission approved the second petition to settle on February 2, 2010, with some modifications. On February

---

**2.** Appellant did not brief this issue, and we do not consider it. *See* Maryland Rules of Procedure, Rule 8–504(a)(5).

**3.** See note 2.

22, 2010, Verizon notified PSC that it had accepted the proposed modifications.

The six cases settled by Order 83137 are: (1) PSC Case 9114, begun in August 2007 to investigate Verizon's service quality as a result of consumer complaints; (2) PSC Case 9133, begun in October 2007, which rejected Verizon's requested price increases, which were not tied to service quality; (3) PSC Case 9120 which reviewed whether Verizon could bundle services with affiliates and increase its prices without violating Verizon's Price Cap Plan;[4] (4) PSC Case 9072, which reviewed Verizon's request to reclassify some of its services as competitive; (5) PSC Case 9121, which investigated local calling areas and foreign exchange prices; and (6) PSC Case 9123, which was filed by the Office of People's Counsel following complaints by customers who had switched from the older copper wire system to a fiber optic service. Case 9123 sought to determine if Verizon was adequately informing its customers of the difference between the two services.

Order 83137 is sixty-six pages long. It found that "Verizon's service quality performance ha[d] fallen far below [PSC's] regulatory standards, and neither competitive market forces nor an open service quality investigation ha[d] improved Verizon's performance." The regulatory standard of principal concern on this appeal is COMAR 20.45.04.08. It provides:

".08 **Trouble Reports.**

"A. Each utility shall provide for the receipt of customer trouble reports at all hours.

"B. Trouble Reporting.

"(1) Arrangement shall be made to clear all trouble of an emergency nature at all hours, consistent with the bona fide

---

4. The Price Cap Plan was Verizon's former AFOR, to be modified or replaced by the settlement at issue here. Following the Commission's order in Case 9120, Verizon filed for judicial review in the Circuit Court for Baltimore City. That case, *Verizon Maryland Inc. v. Public Serv. Comm'n,* Civil Action No. 24–C–08–003892 (2010), was voluntarily dismissed on February 25, 2010, pursuant to PSC Order 83137.

needs of the customers and the personal safety of the utility personnel.

"(2) Arrangement shall be made to clear all out-of-service troubles, not requiring unusual repairs, within 8 hours of the report to the company (excluding clock hours between 5 p.m. and 9 a.m. weekdays and Saturdays, Sundays, and holidays).

"(3) Arrangements shall be made to clear all non-out-of-service troubles, not requiring unusual repairs, within 24 hours of the report to the company (excluding clock hours between 5 p.m. and 9 a.m. weekdays, and Saturdays, Sundays, and holidays).

"(4) If unusual repairs are required, or rehabilitation programs or other factors preclude clearing of reported troubles promptly, when practical, the customer shall be so notified and an estimated time given as to when the trouble will be cleared.

"C. Appointment Missed. The utility shall grant appointments to customers on reported troubles which are consistent with the objective intervals of clearance as specified in § B(1), (2), and (3), above. If appointments with the customer cannot be kept, the utility shall make every reasonable effort to notify the customer in timely fashion of the delay. The number of appointments the utility fails to meet may not be greater than 20 percent of the total commitments given per month with a district service center.

"D. Subsequent Trouble Reports. The utility shall make reasonable efforts to prevent subsequent reports through the proper and effective administration of §§ B and C, above. To the extent possible, the utility shall grant appointments which are consistent with the needs of the customer. The rate of the subsequent reports may not be greater than 13 percent of the total reports per month registered within a district service center.

"E. Repeated Trouble Reports. It is incumbent upon the utility to make the necessary tests and inspections on reported troubles to prevent customers from again experi-

encing the same type trouble. These tests and inspections shall include all necessary and reasonable repairs and rehabilitation efforts which the utility feels are necessary to keep repeated reports at minimum levels. The rate of the repeated reports may not be greater than 25 percent of total trouble reports registered per month within a district service center.

"F. The utility shall keep such records of customer complaints and trouble reports as will enable it to review and analyze its procedures and actions as an aid in rendering improved service."

The Order further compared and contrasted the second settlement offer with the previously rejected first offer. In particular, PSC noted that Verizon's first proposal for settlement included the following provisions that were unacceptable:

"Retrospective credits for missed appointments could not exclude customers who suffered missed appointments but had their complaints resolved within 24 hours of the missed appointment.

"The two-day proxy for the eight-hour standard set forth in COMAR 20.45.04.08[B(2)] could not average times to restore service for businesses and residential customers.[5]

"Verizon could not exclude customers [from retrospective credits] 'who agreed or failed to object to Verizon's standard appointment offer by deeming them to have agreed affirmatively to an appointment longer than two calendar days from their call.'

"The next installation missed appointment metric could not exempt customers moving from regulated voice service over copper lines to regulated voice service over fiber.

---

5. "Proxy" is PSC-speak for a way of measuring compliance with the governing regulation. The rejected settlement had proposed utilizing an *average* interval of two calendar days to measure compliance with the eight-hour standard from report of an out-of-service (OOS) trouble to the restoration of service, in order to account for the exemptions, *i.e.*, unusual repairs, weekday work hours, weekends and holidays.

"The amount of Verizon money at risk as a function of its failure to satisfy customer service metrics must be increased so that it 'mirror[ed] more closely the revenue increases Verizon seeks under the current Price Cap Plan and the new AFOR the proposed settlement would create.' [6]

"Missed appointment compliance must be measured monthly rather than quarterly, because COMAR 20.45.04.08C prescribes a monthly standard, and Verizon could not meet the missed appointment metric by extending its standard appointment times.

"The Service Quality Plan must ensure State-wide consistency, so that Verizon cannot comply with State-wide standards by 'concentrating its efforts on the Baltimore–Washington corridor and leaving other parts of the State with sub-standard service.'

"The Service Quality Plan could not terminate automatically due to the passage of time or erosion of Verizon's market share, but rather only after Verizon 'meets and sustains the required level of performance ... for four consecutive quarters.' "

---

6. Money "at risk" refers to the maximum amount of bill credits that Verizon would pay if a performance standard was not met. For example, the initial settlement proposal concerning the two calendar day proxy was the following:

"(a) If Verizon Maryland exceeds a quarterly Average Days to Repair Total Voice Out–of–Service Network Troubles for two calendar days for a particular quarter, Verizon Maryland will pay $500,000 on a pro rata basis in the form of bill credits to current Verizon Maryland residential customers as of the date the credits are issued who experienced an OOS network condition lasting more than four consecutive calendar days during the quarter at issue. If Verizon Maryland fails to meet the standard in this subparagraph for four quarters in a row, the amount at risk per quarter shall increase by $500,000 for a total of $1 million per quarter, except that, if Verizon thereafter meets the standard for one quarter, the amount at risk per quarter shall revert to the original $500,000 per quarter under this subparagraph."

Similar proposals for non-compliance with COMAR 20.45.04.08(C) and (E), dealing respectively with missed appointments and repeated trouble reports, were $250,000 per quarter with a $500,000 ceiling per quarter for each class of non-compliance.

Order 83137 discussed at length Verizon's response to each of these issues. Particularly relevant here is the discussion of the "Service Quality Plan" (Plan), which the Commission noted was the "heart" of the second settlement offer. The Plan created an AFOR. It "define[d] new proxies, new and larger penalties if Verizon fail[ed] to meet these proposed standards, and a more stringent, performance-based end-point." Order 83137 enumerated five tenets of the Plan that would be implemented by Verizon. Specifically, (1) the Plan would measure Verizon's performance in hours a residential voice customer was without service, instead of by the two-day proxy, and measure without including business customers; [7] (2) the Plan would measure Verizon's performance both on a state-wide basis and also according to four intra-state regions, thereby specifically addressing PSC's concern that parts of the State, outside of the Baltimore–Washington corridor, were not receiving proper quality of service; (3) Verizon increased its "money at risk" to $6 million per year, which more closely "mirrored" the revenue increase Verizon sought under the new AFOR; [8] (4) the Commission noted that Verizon contin-

7. The Commission's concern was that business customers historically had received more prompt repair service.

8. The approved Plan provides, in part, as to the $6 million at risk as follows:

"16. ... A per-customer credit amount (the 'SQ Credit') for Eligible Customers shall be calculated based on data from January 2008 through December 2008 (the 'Test Period') as follows:

"$6,000,000
÷
"Number of Verizon Maryland customers experiencing a residential out-of-service network condition lasting more than 48 hours during the Test Period + 23.57% of total repair appointments during the Test Period.

"17. The SQ Credit shall be applied to accounts of Eligible Customers as follows:

"(a) If Verizon Maryland clears less than 80% of residential voice out-of-service network trouble reports on a state-wide basis within 48 hours in a particular quarter, as reported on its quarterly reports in accordance with Paragraph 15 and Exhibit 1, Verizon Maryland shall apply the SQ Credit to the account of each Eligible Customer experiencing a residential out-of-service network condition lasting more than 48 hours during that quar-

ued problematically to propose excluding customers who agreed to Verizon's standard appointment time from the calculation of its service quality metrics; and (5) consistent with the prior order rejecting Verizon's first settlement offer, "Verizon would be released from its crediting obligations . . . only after meeting both the out-of-service and missed appointments metrics for four consecutive quarters."

In its lengthy analysis, the Commission found that the settlement contained "significant public benefits" including credits to compensate customers for extended loss of service, a connection between future price increases and improved quality of service, reductions in the price of foreign exchange service, funding for outreach programs to educate lower income customers regarding telephone service and possible discounts, and the development of a program which would enable disabled and elderly customers to pre-certify for priority repair service. The Commission further found that the AFOR would "benefit Verizon's customers . . . by providing a framework for improved service at reasonable rates . . . [and] also by bringing about what [it] hope[d would] be a productive and long-lived regulatory détente." The Commission concluded that "approval [of the proposed AFOR was] consistent with the public interest and the statutory standard for Alternative Forms of Regulation" pursuant to PUC § 4–301.

CWA sought judicial review of Order 83137 in the Circuit Court for Baltimore City which affirmed the Commission's

---

ter. If Verizon Maryland clears at least 80% of residential voice out-of-service network trouble reports on a state-wide basis within 48 hours but fails to clear at least 95% of residential voice out-of-service network trouble reports on a state-wide basis within 96 hours, as reported on its quarterly reports in accordance with Paragraph 15 and Exhibit 1, Verizon shall apply the SQ Credit to each Eligible Customer experiencing a residential out-of-service network condition lasting more than 96 hours during that quarter.

"(b) If Verizon Maryland fails to meet the standard for Appointments Missed in COMAR 20.45.04.08(C) in any given month, Verizon Maryland shall apply the SQ Credit to each Eligible Customer experiencing a missed repair appointment during that month."

(Footnotes omitted).

approval of the AFOR. CWA then appealed to the Court of Special Appeals. This Court, on its own motion, granted certiorari prior to consideration of the case by the intermediate appellate court. *Communications Workers v. Public Serv. Comm'n,* 420 Md. 463, 23 A.3d 895 (2011).

Additional facts will be stated in the discussion of particular issues.

## CWA's Arguments

CWA's attack on the AFOR is directed primarily at the service quality aspects of Order 83137. CWA's principal contention is that the language of PUC § 4–301(b)(1)(ii), allowing the Commission to adopt an AFOR if it finds that the AFOR "protects consumers by ... *ensuring* the quality, availability, and reliability of telecommunications services throughout the State," requires literal interpretation. (Emphasis added). Because the Commission recognized in its discussion of the second settlement offer that the end result after implementation of the AFOR for service quality was not assured, CWA submits that PSC did not meet the statutory requirement of "ensuring" success, and thus the Order is "affected by an error of law."

Casting the same argument in factual terms, CWA contends that there is "no evidence in the record that the Proposed Settlement" will meet the § 4–301(b)(1)(ii) standard, as CWA construes it. Appellant says that the "assertions by Verizon's lone witness that Verizon's proposal will work" are unsubstantiated. The Union particularly criticizes Order 83137 because the methods by which Verizon is to achieve the performance metrics are left to Verizon to develop and are not dictated by PSC. Rather, in addition to the reports on OOS clearances, the Commission required Verizon to file an annual report setting forth Verizon's operational plan. The Union avers that Verizon did not "undertake[ ] any assessments of the problems with the existing copper network, the amount of funds that would be required to repair and maintain [it], nor the number of personnel that would be required ... to provid[e] adequate service." CWA asserts that § 4–301 requires Verizon to outline a specific plan before the AFOR may be adopted.

Thus, the Union concludes, PSC "has put the cart before the horse. It has approved the AFOR and then asked for a plan rather than asking for the plan in order to determine if it can approve the AFOR."

CWA next argues that the Commission erroneously employed a different standard than that required by law when it approved the second settlement offer. The assertion is that PSC was not permitted to balance the interests of Verizon with the interests of the consumers in deciding the case.

CWA's third argument is that the Order "consistently misstate[d] the position of the CWA set forth in [its] testimony and briefing." CWA states that, contrary to the notions PSC expressed in the Order, CWA's witness recommended rejection of the second offer for settlement. This "mischaracterization," in CWA's view, constitutes grounds for reversal because the Commission "use[d] as one of [its] key building blocks ... [the fact] that no party contended that the Commission should reject the proposal."

### Verizon's Arguments

Verizon contends that CWA's argument, based on the term "ensuring," in PUC § 4–301(b)(1)(ii), is unsupported by case law and would create an unworkable requirement. If PSC must "guarantee and prove a definitive and specific future outcome," Verizon submits, any decision by PSC would be legally insufficient, "since by its very nature, PSC must make predictive judgments." More broadly, Verizon avers that "no agency or administrative or judicial body can ever guarantee in advance what will happen in the future."

Verizon cites *In re Inquiry into Alternative Forms of Regulating Telephone Cos.*, Case No. 8715, 174 P.U.R.4th 120, at *3, Order No. 73011 (Md. PSC Nov. 8, 1996), which approved the original AFOR proposed by Verizon. There, PSC said that "[w]e *expect* this plan to protect consumers, improve efficiency, encourage modernization of services and equipment, and enable [Verizon] to respond to the emergence of competition and rapid technological advancement in the telecommunications industry." (Emphasis added).

Responding to CWA's argument about balancing, Verizon denies that considering the interests of all the parties when reaching a decision is creating a new standard for approval of an AFOR. The standard applied, Verizon states, was the public interest based on substantial evidence.

### PSC's Arguments

PSC makes many of the arguments asserted by Verizon, and it advances several other points. Although the case presents the settlement of six cases in, or originating in, the PSC, and represents a resolution by which competing interests gave in on some issues and benefitted from others, the Commission did not simply compare the second proposal to the previously rejected proposal. Rather, PSC analyzed "the [second] Proposal as a whole against the statutory AFOR standard and decide[d] independently that it qualifie[d] on its own merits." In addition to the record made when the Commission specifically addressed the second proposal, PSC points out that, when approving the second settlement offer, the Commission reviewed the record on the first settlement proposal, consisting of "hundreds of pages of pre-filed testimony and exhibits, including both fact and expert witnesses, addressing the state of competition for telecommunications services in Maryland, pricing, and other issues bearing on the appropriate structure for an AFOR for Verizon." Further, the Commission reviewed the transcripts of the hearings and the records developed in the cases resolved by Order 83137.

The Commission also notes that if the settlement offer is rejected, Verizon and the PSC would still have to litigate the six cases resolved by the settlement offer. This is risky, according to PSC, because "the ultimate disposition of [those] cases in the courts could limit the Commission to incenting Verizon solely through the threat of civil fines and resulting in Maryland consumers receiving no bill credits for poor service." [9]

---

9. One of the PSC's objections to the first settlement offer was that the relatively small amount at risk for non-compliant service could have

## Standard of Review

██ Here, we review an order of the Commission that approves and enforces a settlement of six contested cases. "Consent orders are final agency orders and reviewable as if the product of a hearing." 3 C.H. Koch, Jr., *Administrative Law and Practice* § 10:13, at 405 (3d ed. 2010). Consequently, we shall review Order 83137 under the standards applicable to the agency's decision in a contested case.

PUC § 3–203 governs judicial review of a final PSC order. It provides:

"Every final ... order ... of the Commission is prima facie correct and shall be affirmed unless clearly shown to be:

"(1) unconstitutional;

"(2) outside the statutory authority or jurisdiction of the Commission;

"(3) made on unlawful procedure;

"(4) arbitrary or capricious;

"(5) affected by other error of law; or

"(6) if the subject of review is an order entered in a contested proceeding after a hearing, unsupported by substantial evidence on the record considered as a whole."

██ So long as a reasoning mind could have reached the same conclusion as the agency, we will not disturb the agency's decision. *Public Serv. Comm'n v. Delmarva Power & Light Co.*, 42 Md.App. 492, 499, 400 A.2d 1147, 1151, *cert. denied*, 286 Md. 746 (1979). Because the Commission is well informed by its own expertise and specialized staff, a court reviewing a factual matter will not substitute its own judgment on review of a fairly debatable matter. *Public Serv. Comm'n v. Baltimore Gas & Elec. Co.*, 273 Md. 357, 362, 329 A.2d 691, 694 (1974).

██ "Questions of law, however, are 'completely subject' to review by courts." *People's Counsel v. Public Serv.*

---

been treated by Verizon as a cost of doing business and would not operate as an incentive to improve service.

*Comm'n,* 355 Md. 1, 14, 733 A.2d 996, 1003 (1999) (quoting *Commissioners of Cambridge v. Eastern Shore Public Serv. Co.,* 192 Md. 333, 339, 64 A.2d 151, 154 (1949)). Even when reviewing questions of law, "the agency's interpretation of a statute may be entitled to some deference." *Id.* However, "that deference is, by no means, dispositive, nor anywise as great as that applicable to factual findings or mixed questions of law and fact." *Id.*

Where the order under review arises from a function committed to the agency's discretion, there is a third standard of review, as described in *Christopher v. Montgomery County Dep't of Health & Human Servs.,* 381 Md. 188, 849 A.2d 46 (2004).

"Finally, the court applies the arbitrary and capricious standard when it reviews an agency's discretionary functions. As we observed in *Spencer* [*v. Maryland State Bd. of Pharm.,* 380 Md. 515, 846 A.2d 341 (2004) ], when an agency acts in its discretionary capacity, it is taking actions that are specific to its mandate and expertise and, unlike conclusions of law or findings of fact, have a non-judicial nature. For this reason, we 'owe a higher level of deference to functions specifically committed to the agency's discretion.' *Spencer,* 380 Md. 515, 529–31, 846 A.2d 341, 349–50. . . . '[A]s long as an administrative agency's exercise of discretion does not violate regulations, statutes, common law principles, due process and other constitutional requirements, it is ordinarily unreviewable by the courts.' *Maryland State Police v. Zeigler,* 330 Md. 540, 557, 625 A.2d 914, 922 (1993). Courts thus generally only intervene when an agency exercises its discretion 'arbitrarily' or 'capriciously.' *Id.* at 558, 625 A.2d at 922."

*Id.* at 199, 849 A.2d at 52.

### Substantial Evidence

The aspects of the alternative form of regulation that are challenged by the Union are those designed to ensure the

reliability of Verizon's residential voice network. To achieve that end, the Commission ordered, *inter alia*, that:

- Verizon comply with the Service Quality Plan that:

 a) established performance standards for Verizon's restoring out-of-service troubles that apply State-wide, and

 b) required Verizon to pay up to $6 million in credits to customers if out-of-service trouble reports were not cleared in accordance with the standards;

- Verizon's request for a rate increase for residential basic service customers be tied to defined tangible improvement in that service;

- Verizon be required to file monthly performance reports; and

- Verizon be required to file annually an operation plan detailing the steps it will take to meet the service quality metrics.

The Commission determined that these features of the AFOR met the very broad requirements of PUC § 4–301. That type of determination is at the essence of the discretion vested in the PSC by the General Assembly. Simply because the Commission chose to require Verizon to meet certain goals, and did not dictate specific means for achieving those goals, does not make the decision arbitrary.

One aspect of Order 83137 dealt with copper retirement. This relates to the replacement, or potential replacement, of copper loops and sub-loops by a fiber optical system (FiOS). Order 83137 rejected a recommendation of the PSC's hearing examiner in Case 1923 that a work group be established to create a set of specific copper retirement rules. Because the record before the Commission demonstrated that Verizon was not currently retiring any copper facilities in Maryland, the Commission concluded that it was unnecessary to convene a work group at that time. We do not understand CWA to argue for an immediate convening of a work group.

Rather, CWA argues that the Commission did not require Verizon to invest money or personnel into its copper network, and, in that way, the Union utilizes the copper retirement

aspects of Verizon's business to argue that the Service Quality Plan is inadequate. The Union asks how the Commission could enter Order 83137 "if Verizon doesn't know what is wrong, how much it will cost to fix it[,] and how many people will be needed to repair and maintain the existing copper network?" The argument merely points out one aspect of the difference between an order that lays out specifics as to how Verizon is to conduct its business and the format used in the AFOR of relying on incentives to cause Verizon to follow an operational plan that would meet the performance standards.

Also, the PSC staff agreed with Verizon's request for approval of the second settlement proposal. For the reasons set forth in its report to the Commission, the staff opined that "as a whole [the proposal] is in the public interest [and] meets the requirements of PUC Article § 4–301." That report furnishes substantial evidence and makes the issue fairly debatable. *See Board of County Comm'rs v. Turf Valley Assocs.*, 247 Md. 556, 233 A.2d 753 (1967). There, a developer sought to reclassify 730 acres from a one and two family residential zoning district into garden apartment and shopping center districts, by analogizing the request to the grant of a special exception. There was no neighborhood opposition to the request. This Court held, reversing the circuit court, that the reclassification could not be sustained absent substantial proof of mistake in the original zoning or subsequent change in conditions. The developer alternatively argued that the change or mistake rule had been satisfied. The planning commission, however, had opposed the reclassification for the reasons stated in its report to the county commissioners. Speaking through Judge Oppenheimer, this Court held that "[t]hat report of itself, constituted probative evidence for the denial of the petition." *Id.* at 562, 233 A.2d at 756–57. *See also Storch v. Zoning Board*, 267 Md. 476, 488–89, 298 A.2d 8, 15 (1972) (holding "that a Report by a Planning Board or by its Technical Staff is, in itself, sufficient evidence to make a Zoning Board's action fairly debatable").

Further, in the course of the hearing, the Commission had Verizon furnish "statistics applying the new proxy to [out-of-

service] data going back as far as January 2007." PSC found this data "extremely useful," because it helped the Commission to "understand Verizon's baseline performance against the proposed standard, at a time when the Service Quality Plan's credits were not in place."

Order 83137 is additionally supported by substantial evidence of a more conventional type. Verizon's expert witness explained how the details of the second settlement proposal met or addressed each objection and concern that the Commission had raised concerning the first settlement proposal.

There was substantial evidence to support Order 83137.

### "Ensuring"

■ Faced with a huge administrative record that overflows with substantial evidence supporting the challenged AFOR, CWA places its principal emphasis on a narrow construction of "ensuring" in PUC § 4–301(b)(1)(ii) ("ensuring the quality, availability, and reliability of telecommunications services throughout the State"). The argument is based on a reservation expressed by the Commission over whether its Service Quality Plan would motivate Verizon sufficiently to attain the performance and, thereby, the statutory goals.

The Commission's reservation, in context, is fairly presented in the following passage from Order 83137:

"We have serious concerns about whether and how Verizon will bring about the improvements it is committing in the Proposal to make. Verizon admitted during the hearing that neither the measures it had taken since our original Show Cause Order in Case No. 9114, including hiring and moving technicians and increasing its preventive maintenance budget, nor the looming threat of our service quality investigation had succeeded in improving Verizon's service quality performance. Its monthly performance reports bear this out. Verizon also testified that it had hired additional new technicians, but the Union questioned whether Verizon had increased the number of available technicians, particularly since it also declared a surplus of 165 technicians in

Maryland. Either way, Verizon is not in compliance with our service quality regulations at this writing, and something has to change.

"If we knew with certainty what set of actions would bring about the necessary improvement in Verizon's service quality, we would have ordered them long ago. Because we do not, we can and will do the two next best things. *First,* with the modifications we have made above, the Service Quality Plan will establish the levels of performance we expect Verizon to attain, and will impose serious, ongoing sanctions (in the form of credits to customers) until Verizon actually achieves them. *Second,* whether or not *we* could formulate an operational plan designed to achieve these improvements, *Verizon* must do so if it is to have any hope of achieving them. Accordingly, as part of the ongoing reporting we will require as part of this Order, we direct Verizon to file annually an Operational Plan detailing the steps it will take to meet the service quality metrics. We will not prescribe a particular plan, nor will we substitute our judgment for Verizon's as to what operational steps will best accomplish its service quality goals. But we will review the Plan to determine whether it contains sufficient detail to allow us to monitor Verizon's progress, we will require monthly reporting against the Plan, and we will take appropriate action if the Plan fails to improve service quality after a reasonable period of time."

Despite the reservation, the Commission, in its discretion, found that, with certain modifications, "approval [of the second settlement proposal] is consistent with the public interest and the statutory standard for Alternative Forms of Regulation." The reservation is no more than an expression of the concept articulated by Oliver Wendell Holmes: "Certitude is not the test of certainty. We have been cock-sure of many things that were not so." O.W. Holmes, *The Natural Law,* printed in Collected Legal Papers, 311 (Harcourt, Brace and Howe 1920).

Examples of usages of the term, "ensure," in contexts where it cannot possibly mean a completely certain result, may be found in William S. Hein & Co., Inc., *Modern Dictionary for*

*the Legal Profession* (3d ed. 2001). There, "Managed Care Organization" is defined as an organization that contracts for prearranged fee schedule services by health care providers, whose "decisions are systematically reviewed by the M.C.O. to ensure that the care provided was medically necessary and cost efficient." Query: Why do governments have Medicare and Medicaid fraud units? "Quality Assurance" is defined as "a system of controls used in manufacturing to ensure that the finished product is complete, operational and ready to sell to the consumer." Query: Why are there product liability cases? "National Conference of Bar Examiners" is defined as a nonprofit organization which prepares uniform bar examination components and "checks the personal references and employment histories of J.D. candidates and contacts law enforcement agencies to ensure that individuals taking the exams are competent and ethical." Query: Why do we have legal malpractice cases and an Attorney Grievance Commission?

*The Oxford English Dictionary* (Clarendon Press, corrected reissue 1933) lists nine meanings for "ensure." They are:

"1. To make (a person) mentally sure; to convince, render confident.

"2. To give security to, pledge one's faith to (a person) for the execution of a promise.

"3. To pledge one's credit (to a person); to tell (a person) confidently that something is true.

"4. To guarantee (a thing) to a person; to warrant (a fact).

"5. To engage (a person) by pledge or contract.

"6. To secure, make safe (against, from risks).

"7. To insure (a person's life, property, etc.).

"8. To make certain the occurrence or arrival of (an event); or the attainment of (a result); = ASSURE.

"9. To make (a thing) sure to or for a person; to secure."

The Commission's finding of compliance with § 4–301 employs the second usage. Having established criteria for the quality and reliability of telecommunications services in the

Quality Service Plan, PSC required Verizon to give security, in the form of the $6 million of at-risk funds, to ensure the execution of Verizon's promise to meet those standards. CWA's argument, on the other hand, employs the eighth possible meaning by saying that the Commission must make certain the attainment of the performance standards.

■■■ Assuming that "ensuring" creates an ambiguity in the statute, we turn to the rules of statutory construction. "Where the meaning of the plain language of the statute, or the language itself, is unclear, 'we seek to discern legislative intent from surrounding circumstances, such as legislative history, prior caselaw, and the purposes upon which the statutory framework was based.'" *People's Counsel v. Public Serv. Comm'n,* 355 Md. 1, 22, 733 A.2d 996, 1007 (1999) (quoting *Lewis v. State,* 348 Md. 648, 653, 705 A.2d 1128, 1131 (1998)).

In *People's Counsel,* this Court reviewed the PSC Order that approved the Price Cap Plan for Verizon. The issue was "whether telecommunication rates set pursuant to Maryland Code (1957, 1995 Repl.Vol.), Article 78, § 69(e), an 'alternative' form of regulation, must meet the 'just and reasonable rates' requirement of the traditional rate of return regulatory scheme." *People's Counsel,* 355 Md. at 6, 733 A.2d at 998.[10]

---

**10.** Article 78 was repealed by the Acts of 1998, ch. 8, § 1, effective October 1, 1998, and recodified in the Public Utility Companies Article, without substantive change. The provisions of former § 69(e) are now codified in PUC § 4–301. *See People's Counsel,* 355 Md. at 6, 733 A.2d at 998.

PUC § 69(e) provided the following:
 "(e) *Regulation of telephone company.*—Notwithstanding the provisions of subsection (a) of this section or any other provision of law to the contrary, the Commission may regulate a telephone company *by means of alternative forms of regulation,* which may include, but not limited to, the use of private regulation, revenue regulation, ranges of authorized return, rate of return, categories of services, or price indexing, if it finds, after notice and hearing that the alternative form of regulation protects consumers by, at a minimum, producing affordable and reasonably priced basic local exchange service, as defined by the Commission, *by ensuring the quality, availability, and*

Following the passage of § 69(e), the Commission received four Price Cap proposals on which hearings were held. Thereafter, PSC issued the order being contested in *People's Counsel.* "Under [this] plan, the PSC set the initial price for telecommunication services, with future price changes being controlled by a formula that [took] into account the rate of inflation, the increasing productivity of the Company and costs ... that are beyond the Company's control." *Id.* We noted that the approved plan adopted a " 'broader and more forward-looking measure of rate reasonableness' " than could otherwise be had without the adoption of an AFOR. *Id.* at 7, 733 A.2d at 998. Because § 69(e) "ha[d] never been interpreted, much less consistently applied, for a substantial period of time," and because PSC's "proffered interpretation ... [was] neither long-standing nor a product of a 'process of reasoned elaboration,' the scope of [our] review [was] essentially plenary, with a primary reliance upon the plain meaning and purpose of the statute." *Id.* at 17–18, 733 A.2d at 1005.

We held that PSC "properly exercised its discretion, as authorized by the General Assembly" when it interpreted "just and reasonable rates." Looking to the legislative history of § 69(e), we said that "there is no dispute that § 69(e) was enacted to achieve three legitimate goals: (1) provide price and quality protection for Maryland customers, (2) encourage the development of competition in the regulated telecommunications industry, and (3) protect the public interest." *Id.* at 27, 733 A.2d at 1010. "To achieve these goals, the Legislature authorized the Commission to regulate telephone companies 'by means of alternative forms of regulation.' " *Id.* We stated that the AFORs were "intended to achieve the goals enumerated and that they are, therefore, rationally related to achievement of those objectives." *Id.* When approving the Price Cap Plan, PSC had found, *inter alia*, that the " 'plan also ensure[d] the quality, availability, and reliability of telecommunications

---

*reliability of telecommunications services through the State;* encourages the development of competition; and is in the public interest." (Emphasis added).

services *throughout the State.' " Id.* (quoting PSC Order No. 73011). We held that the Commission was not arbitrary in its definitional interpretations of § 69(e), that its findings were supported by " 'rational analysis,' " and that it did not abuse its discretion in approving the Price Cap Plan as an AFOR under then § 69(e). *Id.* at 30, 733 A.2d at 1011.

*People's Counsel* determined that the General Assembly intended that an AFOR could be forward looking and goal oriented. Because precognition is not an attribute of mere humans, the General Assembly could not have intended that the Commission be absolutely certain, when ordering the subject AFOR, that it would achieve its stated goals. The Commission did not commit an error of law by expressing the commonsense observation that it could not guarantee the future.

### PSC Statement of Union Position

In Order 83137 the Commission at one point stated that the Union "stopped short of asking us to reject the Proposal entirely," and, at another point, the Commission observed that "[n]o party contended that we should reject the Proposal completely[.]" CWA then points to the testimony of its witness concerning the second settlement offer, and to statements in its brief before the PSC, urging that the proposal be rejected. It seems to us that the Commission was saying that CWA was not objecting to each and every aspect of the entire settlement package while the Union was saying that, because of the reasons that it gave, the proposal should be completely rejected. The dispute is immaterial to the merits of our judicial review. The power of the Commission is not restricted by a need for the consent of intervenors before adopting an AFOR, and reading Order 81317 as a whole makes plain that the result was not intended to be dependent on the Union's approval. It is sufficient that there was substantial evidence to support that order and that the Commission made no error of law.

### New Standard for Approval

 The Commission stated that "[i]n making the decisions set forth in this Order, we have sought to balance the interests of [Verizon] with the interests of its customers and our State as a whole." CWA says that § 4–301 contains no balancing test and that the correct standard to be applied "is grounded in the protection of consumers, the encouragement of competition and the public interest."

At any proceeding before the Commission, a party, including a public service company, may "present evidence[ ] and present argument[.]" PUC § 3–107(1). Obviously, the Commission should consider that evidence. Further, the public interest and the protection of consumers requires that the public service company be able to deliver its service at fair and reasonable charges. This necessitates considering, or "balancing," the interests of the public service company.

For all the foregoing reasons, we shall affirm.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED.**

**COSTS TO BE PAID BY THE APPELLANT.**