REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2437

September Term, 2014

_____

ACCOKEEK, MATTAWOMAN,
PISCATAWAY CREEKS COMMUNITIES
COUNCIL, INC.

v.

MARYLAND PUBLIC SERVICE
COMMISSION, *et al.*

_____

Wright,
Arthur,
Raker, Irma S.,
    (Retired, Specially Assigned),


JJ.

_____

Opinion by Arthur, J.

_____

Filed:  March 30, 2016

Pursuant to Md. Code (1998, 2010 Repl. Vol., 2014 Supp.), §§ 7-207 and 7-208 of the Public Utilities Article ("PUA"), the Maryland Public Service Commission authorized Dominion Cove Point LNG, LP ("Dominion"), to construct an electric generating station to power a natural gas liquefaction facility. The Circuit Court for Baltimore City affirmed the decision after Accokeek, Mattawoman, Piscataway Creeks Communities Council, Inc., a nonprofit environmental advocacy organization, petitioned for judicial review. On appeal, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A.     **The Dominion Cove Point Liquefied Natural Gas Terminal**

Dominion owns and operates a natural gas import terminal on the western shore of the Chesapeake Bay near Cove Point in Calvert County.[1] The Cove Point terminal receives imported liquefied natural gas (LNG) from ocean-going tankers, vaporizes the LNG, and transports the gas by pipeline to an interstate transmission grid for consumption.

In 2011, Dominion announced plans to convert the Cove Point site from an import-only terminal to a bi-directional terminal. Proposed liquefaction facilities, covering approximately 49 acres, would liquefy natural gas from domestic sources, so that it could be stored in canisters, loaded onto vessels, and exported abroad. Dominion sought approval from the Federal Energy Regulatory Commission to construct the liquefaction facilities and approval from the federal Department of Energy to export LNG

---

[1] For more details about the history of the Cove Point terminal, see *Sierra Club v. Dominion Cove Point LNG, L.P.*, 216 Md. App. 322, 325-29 (2014).

to foreign countries.

As a major component of the project, Dominion planned to install combustion turbines to mechanically drive the refrigerant compressors used in the liquefaction process.[2] Dominion proposed a design that would repurpose waste heat from those turbines to generate much of the electricity required for the liquefaction process. This design called for the construction of an electricity generation station, closely integrated into the larger liquefaction facilities. The generating station, with a "name-plate capacity" of 130 megawatts,[3] would not be linked to the larger power grid, as the generated electricity would be consumed exclusively on site.

B.      **Application for Certificate of Public Convenience and Necessity**

At the same time that Dominion was pursuing federal approval for the liquefaction project, Dominion applied to state authorities for permission to construct the generating station. Under Maryland law, a party may not begin construction on a generating station unless that party obtains a certificate of public convenience and necessity from the Public Service Commission. PUA § 7-207(b)(1)(i). "The certificate may be granted only after

---

[2] The liquefaction process involves cooling natural gas to approximately negative 260 degrees Fahrenheit. United States Department of Energy, Office of Fossil Energy, "Liquefied Natural Gas," http://energy.gov/fe/science-innovation/oil-gas/liquefied-natural-gas (last visited Dec. 22, 2015). LNG, the condensed form, takes up about 1/600th of the volume of natural gas in its gaseous state. *Id.*

[3] "Nameplate capacity," or "generator nameplate capacity (as installed)," means "[t]he maximum rated output of a generator, prime mover, or other electric power production equipment under specific conditions designated by the manufacturer." https://www.eia.gov/tools/glossary/index.cfm?id=N (last visited Dec. 22, 2015). "Installed generator nameplate capacity is commonly expressed in megawatts (MW) and is usually indicated on a nameplate physically attached to the generator." *Id.*

other state agencies evaluate and comment upon the proposal, the [Commission] holds a public hearing which local governing bodies may attend," and the Commission considers the recommendation of the local governing body and various societal effects of the generating station. *See Potomac Elec. Power Co. v. Montgomery Cnty.*, 80 Md. App. 107, 114 (1989), *aff'd sub nom. Howard Cnty. v. Potomac Elec. Power Co.*, 319 Md. 511 (1990). For certain generating stations, the party must apply for the certificate at least two years before beginning construction. PUA § 7-208(c)(1).

On April 1, 2013, Dominion submitted an Application for Certificate of Public Convenience and Necessity. Dominion requested expedited treatment so that it could begin construction before February 2014.

The Commission initially delegated the matter to a public utility law judge, who set a procedural schedule. Multiple parties intervened, including two environmental organizations: the Sierra Club and Chesapeake Climate Action Network (CCAN). The Commission later rescinded its delegation of the proceedings and set the matter for hearing by an en banc panel of commissioners.

In December 2013, Accokeek, Mattawoman, Piscataway Creeks Communities Council, Inc. (AMP), moved to intervene out-of-time. AMP, whose primary mission is to protect local waterways, asserted that the Sierra Club and CCAN, as national and regional environmental groups, would not adequately represent its interests in the proceedings. Over Dominion's objection, the Commission granted AMP's intervention request.

Through the Power Plant Siting and Research Act of 1971 and its subsequent

-3-

revisions, the General Assembly has established a comprehensive process for evaluating the effects of proposed power generation facilities on surrounding communities. In accordance with the siting law, the Commission solicited a review from Maryland's Power Plant Research Program (PPRP). PPRP, a division of the Department of Natural Resources, is a "continuing research program for electric power plant site evaluation and related environmental and land use considerations." Md. Code (1974, 2012 Repl. Vol.), § 3-301(d) of the Natural Resources Article ("NR"). In coordination with other government agencies, PPRP studies the environmental and socioeconomic effects of electric power generation facilities in Maryland. NR § 3-303.

PPRP submitted an environmental review report on behalf of seven Maryland agencies.[4] PPRP concluded "that the power plant site [wa]s suitable and that the generating facility c[ould] be constructed and operated in accordance with all applicable environmental regulations," provided that the Commission adopted an extensive list of conditions. First and foremost, PPRP recommended that the Commission require Dominion to obtain necessary federal approvals for the larger LNG facility before constructing the generating station. The majority of the proposed limitations related to air quality. The remaining requirements concerned terrestrial and aquatic ecology, stormwater management or erosion and sediment control, water supply, cultural resources, visual quality, emergency preparedness and security, traffic, and noise.

---

[4] The report was approved by the secretaries of the Departments of Natural Resources, Agriculture, Business and Economic Development, the Environment, Planning, and Transportation, as well as the director of the Maryland Energy Administration.

### C.    Evidentiary Hearing Before the Commission

The Commission received testimony and heard arguments at an evidentiary hearing on February 20, 21, and 24, 2014.

In support of its application, Dominion offered testimony from consultants and from company executives.  Dominion asserted that the project would result in "significant economic benefits in Maryland," in the form of temporary jobs for construction of the facilities, permanent jobs for the operation of the facilities, and increased tax revenue for Calvert County.  Dominion admitted that the export of LNG would put upward pressure on energy prices, but Dominion argued that benefits to the local economy would outweigh the potential adverse effects on consumers.

AMP and the other environmental groups opposed the application, offering testimony from environmental experts and energy industry experts.  AMP argued that the Commission could not consider benefits of the larger liquefaction project in determining whether to certify the generating station.  AMP also argued that Dominion had provided inadequate information about the economic benefits of the generating station and that the application should be denied on that basis.

PPRP submitted extensive testimony from experts in air quality, water management, geology, ecology, engineering, and economics.  The program's deputy director testified that the power plant could be constructed and operated in compliance with applicable environmental and other regulations as long as Dominion complied with

PPRP's proposed conditions.[5]

The Public Service Commission's staff presented its analysis of the effect of the generating station on the power grid. The Commission's staff concluded that the proposed station, as an "islanded" project that benefitted a single energy user, would not adversely affect the grid. The staff concluded that the Commission could approve the project, subject to a set of conditions.

### D.    Post-Hearing Developments

The Commission presided over a public hearing in Lusby on March 1, 2014, in accordance with PUA § 7-207(d). Approximately 80 members of the community offered comments either in support of or in opposition to Dominion's proposals. A member of the Board of County Commissioners for Calvert County spoke at the hearing to announce the Board's "unanimous support" for the project. In a letter dated March 25, 2014, signed by the five county commissioners, the Board affirmed that it "fully support[ed]" Dominion's application for a certificate to construct the generating station.

At AMP's request, the Commission extended the public comment period until April 2, 2014. In total, the Commission received over 60,000 written comments and letters. Most of the comments, from both proponents and opponents of the project, emphasized broader consequences of the LNG facility rather than direct effects of the

---

[5] In addition to authorizing construction, a certificate of public convenience and necessity includes a permit for appropriation or use of waters of the State. Md. Code (1996, 2013 Repl. Vol.), § 5-502(e) of the Environment Article. The certificate effectively constitutes an air emissions permit as well, because the Department of the Environment may not require a separate air emissions permit for a generating station constructed pursuant to a certificate of public convenience and necessity. *Id.* § 2-402(3).

construction and operation of the generating station.

In a post-hearing reply brief, Dominion stated that it would accept all conditions proposed by PPRP and by the Commission's staff, along with four "additional conditions developed at the suggestion of the [c]ommissioners." As Condition J-3, Dominion offered to "make a one-time contribution in the amount of $400,000 to the Maryland Energy Assistance Program, or other low income energy assistance program to be specified" by the Commission.

As a final condition, Condition J-4, Dominion offered to "provide $20.38 million in in-kind contributions and funding to support Maryland [Greenhouse Gas Reduction Act] goals." Under this proposal, Dominion would offer "[a] $1 cost perpetual license of Dominion's EDGE® Energy Efficiency Program" to Maryland electric distribution utilities and would "service, maintain and provide software updates at no cost for the first 4 years" to each utility that adopted the program. Dominion agreed that, in the event that utility companies might decline to adopt its energy efficiency technology, Dominion would finance a trust or similar instrument with funds "not to exceed $20.38 million," to support other greenhouse-gas reduction projects determined by the Commission.

In a joint reply brief submitted on the same day as Dominion's reply brief, the Sierra Club and CCAN recommended that the Commission require Dominion to make a "significant investment in carbon-free Maryland-based renewables . . . in order to help mitigate several of the most significant adverse impacts of the project."

After reviewing the final briefs, the Commission's staff submitted a comment on the additional conditions proposed by Dominion. The Commission's staff determined

that it would be "unworkable" for utility companies to adopt Dominion's energy-efficiency software, as Dominion had proposed. The staff concluded that "the $20.38 million funding support . . . would be more appropriately directed to the Strategic Energy Investment Fund in which these monies are allocated specifically to greenhouse-gas reduction-related activities."[6]

### E.    Approval from the Commission

On May 30, 2014, by Order No. 86372, the Commission granted the certificate of public convenience and necessity subject to a revised set of conditions. The Commission explained its findings and conclusions in an 83-page opinion and set forth the required conditions in a 64-page appendix. The Commission declared: "if all conditions imposed under this Order are met to address environmental, economic, health and safety impacts demonstrated in this proceeding, the Generating Station can be built in conformity with applicable Maryland and Federal laws and standards, and in a way that will be consistent with the public convenience and necessity standard."

After a comprehensive summary of the testimony and arguments of the parties, the opinion discussed the required statutory considerations:

---

[6] The General Assembly created the Strategic Energy Investment Fund for the purpose of "implement[ing] the Strategic Energy Investment Program." Md. Code (1984, 2014 Repl. Vol., 2015 Supp.) § 9-20B-05(b) of the State Government Article. The purpose of the Strategic Energy Investment Program "is to decrease energy demand and increase energy supply to promote affordable, reliable, and clean energy to fuel Maryland's future prosperity." *Id.* § 9-20B-03. The Maryland Energy Administration administers the Strategic Energy Investment Program. *Id.* § 9-20B-04.

(e) The Commission shall take final action on an application for a certificate of public convenience and necessity only after due consideration of:

(1) the recommendation of the governing body of each county or municipal corporation in which any portion of the construction of the generating station . . . is proposed to be located; and

(2) the effect of the generating station . . . on:

       (i) the stability and reliability of the electric system;

       (ii) economics;

       (iii) esthetics;

       (iv) historic sites;

       (v) aviation safety as determined by the Maryland Aviation Administration and the administrator of the Federal Aviation Administration;

       (vi) when applicable, air and water pollution; and

       (vii) the availability of means for the required timely disposal of wastes produced by any generating station.

PUA § 7-207(e).

Addressing these factors, the Commission first noted that the local governing body had "voted unanimously to support this Project." The Commission agreed with findings of its staff that the generating station would have no adverse effect on the electric system. The Commission concluded that the conditions recommended by PPRP adequately addressed concerns as to the effect of generating station on aesthetics, historic sites, aviation safety, and waste disposal. In assessing the station's effect on air pollution, the Commission focused on whether the project would comply with federal and state clean air laws, an issue that had "taken up perhaps the largest amount of time and testimony in

-9-

th[e] proceeding." The Commission concluded that the project would comply with the requisite air pollution and other standards if Dominion adopted the conditions proposed by PPRP.

According to the Commission, Dominion had the burden "to demonstrate that the benefits of the generating station, including economic benefits, outweigh[ed] the environmental, safety, and societal costs of siting the generating facility[.]" The Commission explained that its task of analyzing the generating station was particularly difficult because much of the testimony had addressed the LNG project as a whole rather than the station itself. The Commission reasoned that the generating station was "likely directly responsible for only a fraction of the air emissions, water impacts, and economic effects of the entire Project." Referring to estimates from Dominion and from PPRP, the Commission noted that the generating facilities "may account for between 5% and 20% of the overall effects of the Project," but the Commission commented that it had "nothing beyond that to further refine the appropriate number."

The Commission highlighted the economic impact analysis from PPRP, which concluded that only a small fraction of overall economic benefits could be attributed to the generating station alone. PPRP's economist gave estimates indicating that the generating facility would account for approximately five percent of construction jobs and two percent of overall salary and wage costs. According to PPRP, once the facility was operational, the project would continue to have a significant revenue effect in the form of property taxes for Calvert County. The Commission cited various projections of the total property taxes for the overall LNG project, but it made no finding as to the portion of

property taxes attributable to the generation station.

The Commission concluded that the economic impacts of the project would not be uniformly positive. The Commission credited studies showing that Dominion's facility, by exporting LNG abroad, would increase gas prices for Maryland consumers. The Commission also concluded that the generating station's "'island mode' of electricity [wa]s not a positive factor in calculating its economic effects." To operate a power plant connected to the grid, a company ordinarily would be required to purchase carbon emission allowances as part of the Regional Greenhouse Gas Initiative.[7] Proceeds from the sale of those allowances are deposited in Maryland's Strategic Energy Investment Fund (SEIF) to finance investments in energy efficiency and conservation programs, renewable energy resources, low-income energy assistance, and other purposes. *See* Md. Code (1984, 2014 Repl. Vol., 2015 Supp.), § 9-20B-05 of the State Government Article ("SG"). Instead of purchasing those allowances, however, Dominion planned to "avail itself of a portion of the free Limited Industrial Exemption set-aside allowances to account for carbon emissions," which would reduce the supply of allowances for future projects. In summary, the Commission stated that "the 'costs' to Maryland ratepayers" in the form of increased energy prices and lost compliance revenues "could be well in excess of $75 million by 2025."

Overall, the Commission identified the most significant negative effects of the

---

[7] The Regional Greenhouse Gas Initiative "is a cooperative effort among the states of Connecticut, Delaware, Maine, Maryland, Massachusetts, New Hampshire, New York, Rhode Island, and Vermont to cap and reduce $CO_2$ emissions from the power sector." http://www.rggi.org/ (last visited Dec. 22, 2015).

generating station as: increased emissions of pollutants that would affect air quality and climate, Dominion's use of a limited supply of industrial greenhouse-gas emission allowances, increased noise, clear-cutting of trees, and the additional burden on the County's transportation infrastructure and the State's water resources. According to the Commission, Dominion had not demonstrated that these "considerable" negative impacts "would be offset by the relatively limited and short-lived monetary benefits accruing to Calvert County through construction employment or through the longer-term tax payments from the Generating Station." The Commission concluded that, even after implementing the conditions proposed by PPRP, the generating facility would not "provide sufficient economic and other benefits to residents of Maryland" to justify granting the certificate.

The Commission determined that Dominion's "last minute agreement" to provide "a $20.38 million 'in-kind' contribution and funding" to advance greenhouse-gas reduction goals was "too speculative and insufficient to provide the necessary offsetting economic benefits to Maryland residents." Adopting the recommendation of its staff, the Commission concluded that the offer "could be more effectively utilized through a direct contribution to the consumer side through the State's Strategic Energy Investment Fund ('SEIF')." As a new condition for approval of the generating station, the Commission directed that the $20.38 million in funds earmarked for Dominion's voltage reduction services be increased to $40 million, to be contributed directly to SEIF over five years.

The Commission also found Dominion's one-time contribution of $400,000 to the Maryland Energy Assistance Program or other low-income energy assistance program to

be inadequate. To mitigate anticipated increases in gas prices for Maryland residents, the Commission directed Dominion to "provide this level of contribution for each of the expected 20 years that the plant is currently under contract to operate, for a total of $8 million."

After the Commission issued the order, Dominion promptly notified the Commission that it had accepted all of the specified conditions. AMP petitioned for judicial review of the Commission's order in the Circuit Court of Baltimore City. After a hearing, the court denied the petition and entered an order affirming the Commission's decision on December 22, 2014. AMP noted a timely appeal from that order.

### QUESTIONS PRESENTED

In this appeal, AMP raises several grounds for reversal of the Commission's order. AMP's brief presents four questions, which we quote:

1. Did [the Commission] violate Petitioner's right to due process by failing to make sufficient findings of fact regarding the positive economic effects of the Generating Station?

2. Was the [Commission's] calculation of economic effects under [PUA] § 7-207(e)(2)(ii) supported by substantial evidence in the record?

3. Did the [Commission] act outside of its statutory authority by imposing $48 million dollars in taxes or, in the alternative, fees which it was not empowered to enact?

4. Did the [Commission] act arbitrarily or capriciously in ignoring competent evidence that showed the [Board of County Commissioners'] recommendation was based on the overall Liquefaction Project, and thus was outside of the [Commission's] statutory authority to consider?

For the reasons explained in this opinion, we answer all four questions in the

-13-

negative and conclude that the order should be affirmed.

## DISCUSSION

In an appeal from a circuit court's judgment in an action for judicial review, our task is to review the underlying decision of the agency. *See, e.g.*, *Mid-Atlantic Power Supply Ass'n v. Maryland Pub. Serv. Comm'n*, 143 Md. App. 419, 432 (2002). The scope of judicial review over decisions of the Public Service Commission is limited by statute. A final decision or order of the Commission is "prima facie correct and shall be affirmed unless clearly shown to be: (1) unconstitutional; (2) outside the statutory authority or jurisdiction of the Commission; (3) made on unlawful procedure; (4) arbitrary or capricious; (5) affected by other error of law; or (6) if the subject of review is an order entered in a contested proceeding after a hearing, unsupported by substantial evidence on the record considered as a whole." PUA § 3-203.

"A great deal of discretion is necessarily vested in the Commission in order that it may properly discharge its important and complex duties." *People's Counsel v. Pub. Serv. Comm'n*, 52 Md. App. 715, 722 (1982). When the agency exercises discretion on a matter specific to its mandate and expertise, court review is generally limited to whether the agency exercised its discretion arbitrarily or capriciously or whether the action violated regulations, statutes, common-law principles, due process, and other constitutional requirements. *Communications Workers of America v. Pub. Serv. Comm'n of Maryland*, 424 Md. 418, 434 (2012). "Because the Commission is well informed by its own expertise and specialized staff," the reviewing court must affirm the Commission's decision as long as the matter is at least fairly debatable, meaning that "a

reasoning mind could have reached the same conclusion as the agency[.]" *Id.* at 433.

Therefore, in reviewing a factual determination of the Commission, the court "'should

not examine the facts in any case further than to determine whether there was substantial

evidence to sustain the order.'" *People's Counsel v. Pub. Serv. Comm'n*, 52 Md. App. at

722 (quoting *Howard Sports Daily v. Weller*, 179 Md. 355, 365 (1941)). Overall, the

courts will not disturb a decision of the Commission "except upon clear and satisfactory

evidence that it was unlawful and unreasonable." *Town of Easton v. Pub. Serv. Comm'n*

*of Maryland*, 379 Md. 21, 30 (2003).

As discussed below, AMP has failed to show that the Commission's decision was

unconstitutional, unsupported by substantial evidence, outside of the Commission's

authority or jurisdiction, or arbitrary or capricious.

**I.**

As its first ground for challenging the Commission's order, AMP contends that the

Commission denied it due process of law by failing to articulate certain factual findings.

Specifically, AMP argues that the Commission violated its "right to due process by

failing to name the value, or possible range of values, [the Commission] assigned to the

economic benefit of the Generating Station." According to AMP, the Commission's

failure to provide those numerical figures deprived AMP of a "meaningful opportunity"

to challenge "how the [PUA § 7-207] balancing test was implemented" in approving the

certificate.

In a contested proceeding, the Public Service Commission is required to issue a

written decision and order that "state[s] the grounds for the conclusions of the

-15-

Commission[.]" PUA § 3-113(a). The requirement of written findings is essential for judicial review, because a court generally may not uphold an agency's decision "'unless it is sustainable on the agency's findings and for the reasons stated by the agency.'" *Baltimore Gas & Elec. Co. v. Pub. Serv. Comm'n of Maryland*, 75 Md. App. 87, 99 (1988) (quoting *United Steelworkers of America AFL-CIO, Local 2610 v. Bethlehem Steel Corp.*, 298 Md. 665, 679 (1984)). The Commission's written findings "must at least be sufficiently detailed to apprise the parties as to the basis for the agency's decision." *Baltimore Gas & Elec. Co. v. Pub. Serv. Comm'n*, 75 Md. App. at 97 (reversing order of Commission because written order included Commission's ultimate factual conclusion without articulating basic evidentiary facts underlying that conclusion); *see also Bucktail, LLC v. Cnty. Council of Talbot Cnty.*, 352 Md. 530, 553 (1999) (explaining that an agency's "[f]indings of fact must be meaningful and cannot simply repeat statutory criteria, broad conclusory statements, or boilerplate resolutions") (citation omitted).

In *Mid-Atlantic Power Supply Ass'n v. Maryland Pub. Serv. Comm'n*, 143 Md. App. 419 (2002), this Court rejected a challenge to the adequacy of certain written orders from the Public Service Commission. In that case, the Commission had approved a settlement agreement and implemented an electric utility restructuring plan. *Id.* at 425-26. This Court held that the order approving the agreement contained the required factual determinations and sufficiently set forth the basis for the Commission's conclusion. *Id.* at 434-35. In its written opinion, the Commission had "reviewed each issue addressed by the Agreement, liberally drawing from the testimony adduced by both sides, while

discussing in detail the evidence presented and the applicable law," and "made findings of fact and conclusions of law, which were later summarized at the conclusion of the opinion[.]" *Id.* at 435.

The appellant in that case contended that the Commission's orders were deficient for failing to address requisite statutory factors. *Id.* at 437-38. The relevant statute, however, stated only that the Commission "shall consider" certain enumerated statutory criteria in making its determination. *Id.* at 438. The Court explained that "the words 'shall consider' in an administrative statute 'only require[] [an agency] to consider the listed factors' of the statute" and do not require the agency "'to make written findings or findings on the record.'" *Id.* (quoting *Lussier v. Maryland Racing Comm'n*, 100 Md. App. 190, 213 (1994)). Consequently, in reviewing an administrative decision based on a statute that requires the Commission only to "'consider' certain enumerated factors . . . 'it is sufficient if the record supports the conclusion that the Commission considered these factors.'" *Mid-Atlantic Power Supply Ass'n v. Maryland Pub. Serv. Comm'n*, 143 Md. App. at 439 (quoting *Lussier*, 100 Md. App. at 213).

The relevant statute here similarly provides that the "Commission shall take final action . . . only after due consideration of," among other things, "the effect of the generating station . . . on . . . economics[.]" PUA § 7-207(e)(2)(ii). Expressly addressing this consideration, the Commission's opinion summarized testimony from Dominion's witnesses estimating the "dollar impact" of the generating station. The opinion recounted the testimony of PPRP's economist, who concluded that income effects attributable to construction of the generating station would be "significantly less" than the estimates

-17-

from Dominion. The Commission also referred to testimony that the overall project would result in "up to $40 million per year in property taxes for Calvert County." The Commission noted other potential benefits, including highway improvements, re-establishment of oyster beds in an offsite area, and the possibility of additional land preservation. The Commission also analyzed potential negative economic effects from the LNG export facility, referring to estimates of likely increases in consumer gas prices and to decreased revenue associated with compliance costs.

In sum, the opinion amply demonstrates that the Commission gave "due consideration" to all of the required factors, including the economic effects of the generating station. This is by no means a case in which the Commission made conclusory findings on a central issue without articulating any evidentiary facts to support those findings. *Cf. Baltimore Gas & Elec. Co. v. Pub. Serv. Comm'n*, 75 Md. App. at 100. The opinion did more than enough to apprise the parties and the courts of the basis for the Commission's decision. *See Mid-Atlantic Power Supply Ass'n v. Maryland Pub. Serv. Comm'n*, 143 Md. App. at 435-36.

While ostensibly criticizing the Commission for allegedly failing to articulate its findings, AMP effectively seeks to use certain details from the Commission's thorough explanation as a basis for requiring even further explanation. In the Commission's opinion, it stated that Dominion had failed to show that monetary benefits from construction employment and longer-term tax payments would offset the potential negative effects of the power plant. For example, the Commission found that Dominion's proposal to contribute $20.38 million to advance greenhouse-gas reduction

goals was "too speculative and insufficient to provide the necessary offsetting economic benefits[.]" On the other hand, the Commission found that it could approve the certificate if Dominion contributed $40 million over five years to the Strategic Energy Investment Fund and $8 million over 20 years to the Maryland Energy Assistance Program.

Based on this series of findings, AMP asserts that "the Order makes clear" that the Commission "assigned a specific value, or range of values, to the economic benefit" of the generating station. AMP theorizes that the Commission reduced all of the considerations to two values: A, the net economic benefits of the station, and B, the overall negative effects of the station. AMP asserts that the Commission then made the following "calculation": first that A was less than B; next that "A + 20.38 million dollars is still less than B"; and finally that "A + $48 million dollars was greater than B." According to AMP, the Commission violated due process by failing to disclose "A," the value or range of values for the generating station's net economic effect.

AMP's argument is creative but unpersuasive. It is not at all "clear" that the Commission reduced, or could have reduced, its analysis to a single dollar-figure or range of figures. The Commission's discussion of economic factors covered the facility's effects on employment, government revenue, and consumer energy prices. Data regarding each of these effects can be expressed in dollar figures, but nothing obligates the Commission to give the same weight to a dollar in property taxes as it gives, for example, to a dollar in wages (which results in additional state and local taxes, as well as other economic benefits). Moreover, the Commission could not simply "add" the

positive economic contributions to Dominion's proposed $20.38 million contribution to reduce energy consumption and greenhouse-gas emissions, as those goals are not strictly economic. For similar reasons, the Commission could not simply "add" $48 million, as an economic benefit, to account for the contributions that it required Dominion to make to the government funds that are designed to achieve environmental objectives and to assist low-income residents, as those goals, too, are not strictly economic.

Even if it were possible to reduce these qualitatively different costs and benefits into a single quantity or range of quantities (as AMP suggests the Commission did and was required to do), the Commission would need to compare those figures against the value of "B" on the other side of the scale. The negative effects identified by the Commission (increased emissions, use of a limited supply of greenhouse-gas allowances, increased noise, clear-cutting of trees, and burdens on transportation and water resources) were largely noneconomic. AMP, in seeking to challenge the Commission's balancing of the competing considerations, incorrectly reasons that this flexible multi-factor balancing can be reduced (and in fact was reduced) to mere "calculations." Like many other determinations that the General Assembly has entrusted to the Commission's discretion, however, the public convenience and necessity standard of PUA § 7-207(e) requires that the Commission consider all relevant facts and factors and exercise reasonable judgment, not that the Commission employ a particular formula or method. *See Potomac Edison Co. v. Pub. Serv. Comm'n*, 279 Md. 573, 585 (1977) (holding that, under statute requiring Commission to determine "fair value" of utility's property, Commission's determination "must reflect the reasonable judgment of the [C]ommission, based on all relevant facts of

-20-

which only several, or indeed but one, may prove to be controlling"); *Bldg. Owners & Managers Ass'n of Metro. Baltimore, Inc. v. Pub. Serv. Comm'n of Maryland*, 93 Md. App. 741, 762 (1992) (holding that statute directing Commission to approve "just and reasonable rates" permitted Commission to use factors other than pure cost of service and did not require any specific formula).

The requirement that an agency make meaningful findings of fact exists in part to protect the "'fundamental right of a party to a proceeding before an administrative agency to be apprised of the facts relied upon by the agency in reaching its decision and to permit meaningful judicial review of those findings.'" *Neutron Prods., Inc. v. Dep't of the Env't*, 166 Md. App. 549, 589 (2006) (quoting *Eastern Outdoor Adver. Co. v. Mayor & City Council of Baltimore*, 128 Md. App. 494, 530 (1999)). The opportunity for "meaningful" review is not necessarily an opportunity for exhaustive review of every possible basis for a petitioner's challenge. *See Neutron Prods.*, 166 Md. App. at 593 (holding that, under statute authorizing agency to assess penalties up to certain individual and aggregate statutory limits, "the agency was not required to assign a particular dollar amount for each category of violation or individual violations").

For a court to conduct meaningful review of a decision to grant a certificate under PUA § 7-207, the findings and the record must at least show that the Commission gave "due consideration" to each of the requisite statutory factors. *See Mid-Atlantic Power Supply Ass'n v. Maryland Pub. Serv. Comm'n*, 143 Md. App. at 439 (holding that where a statute "only requires the Commission to 'consider' certain enumerated factors . . . it is sufficient if the record supports the conclusion that the Commission considered th[o]se

-21-

factors"). The Commission's opinion here sufficiently demonstrates that the Commission did so. There is no need for the Commission to make further written findings.

## II.

In its first challenge, AMP criticized the Commission for failing to assign a specific numerical value for the overall economic benefits of the generating station. In its second challenge, AMP contends that this "unnamed valuation of the economic benefit of the generating station is not supported by substantial evidence in the record." The focus of AMP's argument is that, although the Commission received some evidence about economic effects of the generating station, most of the economic evidence related to the larger LNG export facility.

At the outset, we disagree with AMP's suggestion that evidence concerning effects of the overall liquefaction project was irrelevant in evaluating the effects of the power plant component. As explained in the Commission's opinion, "the sole purpose of the Generating Station would be to serve the proposed expanded LNG operations[.]" The generating station was not only "located within" the larger LNG facility, but was also "very closely intertwined with the components of the broader Liquefaction Project."

Because the components were so inseparably integrated, Dominion encouraged the Commission to consider costs and benefits of the entire project. Experts from PPRP took similar approaches in their siting studies. PPRP's environmental review report concluded that the environmental effects of the power plant could not be separated from the larger liquefaction project. The economic impact analysis from PPRP isolated only some effects specific to the generating station, but at other times analyzed the effects of the

-22-

entire facility. PPRP's economics expert reported that it was "difficult to segregate the generating station" from the larger liquefaction project. Based on a comparison study to a "generic 130 [megawatt] conventional gas combined cycle facility," he concluded that employment and income effects attributable to construction of the electric generation components would be "relatively small" in relation to the entire facility.

During the hearing, the Commission attempted to elicit more specific information about economic effects attributable only to the generating station. One of the commissioners commented that it would be "helpful" if Dominion provided a separate personal and real property valuation for the generation station. An executive from Dominion later offered a "rough estimate" of the "costs and benefits" attributable to the generating station. Based on a comparison to a "very similar existing facility" with the "same configuration," Dominion's witness estimated that "from both a man-hours to construct standpoint and a total dollar impact," the power generation components represented "approximately 20 percent of the overall costs" and "approximately 20 percent of the overall value of the project." He summarized that "from a tax standpoint, from a jobs standpoint" the Commission could allocate 20 percent of costs and benefits to the generating station.

In response to questions about the reasonableness of Dominion's estimate, PPRP's economics expert explained that there were "legitimate reasons why the generation component could not be separated from the liquefaction project," most notably the "common elements" used for both the liquefaction process and for electricity generation.

On appeal, AMP contends that the Commission lacked substantial evidence to

reach a conclusion about isolated economic effects of the generating station. More specifically, AMP asserts that the Commission could not consider property tax payments as a likely economic benefit unless the Commission received direct evidence about the specific portion of property taxes derived solely from the generating station. AMP also argues that the Commission was required to assign a specific numerical value to that portion of the property taxes.

AMP seems to presume that the Commission must meet a high evidentiary standard for a court to uphold its factual determinations. In reality, the substantial evidence test is nowhere near as exacting as AMP's argument suggests. To determine whether the entire record contains substantial evidence to support an agency's findings, the ultimate question is whether a reasoning mind reasonably could have reached the conclusion reached by the agency based on the record. *See, e.g.*, *Spicer v. Baltimore Gas & Elec. Co.*, 152 Md. App. 151, 159 (2003) (citing *Rideout v. Dep't of Pub. Safety & Corr. Servs.*, 149 Md. App. 649, 656 (2003)). The Commission need not rely on direct testimony to support every finding and conclusion, but its findings "may include inferences which can be reasonably drawn from the facts[.]" *Baltimore Gas & Elec. Co. v. Pub. Serv. Comm'n of Maryland*, 75 Md. App. at 97 (citing *Bulluck v. Pelham Woods Apartments*, 283 Md. 505, 515 (1978)).

For example, in *People's Counsel v. Pub. Serv. Comm'n*, 52 Md. App. 715, 716-17 (1982), *cert. denied*, 295 Md. 441 (1983), this Court held that substantial evidence supported a decision of the Commission setting taxicab rates. In that case, taxicab companies had petitioned for a rate increase, based largely on evidence of increases in

gasoline price. *Id.* at 725. The companies "presented very little specific information about their own financial affairs and condition" (*id.*) even though that information was necessary to justify the rate increase. The Commission relied on the findings of a hearing examiner who had "decried the lack of better evidence," but who nonetheless drew a "reasonable inference," based on testimony from the representatives of two companies who mentioned their declining revenues, that revenues were declining throughout the industry. *Id.* at 726.

Writing for this Court, Judge Wilner explained that "[t]he weight to be accorded the kind of evidence presented at the two hearings, unsupported by audited financial statements, was for the Commission to determine." *Id.* at 727. The Commission "was entitled to believe" that the witnesses were "presenting an accurate depiction" of the financial condition of taxicab licensees. *Id.* Even though the evidence was "scanty and largely undocumented," the oral testimony offered by the companies was enough to support the Commission's conclusions about the overall financial condition of the taxicab industry. *Id.*

Applying the substantial evidence test here, we conclude that the Commission had an evidentiary basis on which to reach a conclusion about tax revenues resulting from the generating station. The Commission named three sources of evidence: (1) testimony showing that the overall expansion of the LNG facility would produce up to $40 million per year in property taxes for the County; (2) an estimate from Dominion that the power plant represented "20 percent of the overall value of the project"; and (3) testimony from PPRP's economist that "only a relatively small portion" of other economic effects, with

approximately five percent of temporary construction jobs, would be attributable to the electric generation component.

In explaining its decision, the Commission recognized that it was "difficult," but not impossible, to evaluate the generating station based on testimony that primarily addressed the overall liquefaction project. The Commission referred to Dominion's figure (of around 20 percent) as an estimate of "the 'dollar impact' from the Project [that] could be attributed to the Generating Station" and PPRP's relatively smaller figure (of around five percent) as an estimate of "the economic effects of the generating facility." The Commission characterized the two studies, not only as projections about the narrow issue of construction employment, but as approximations of the "overall effects of the Project[.]" Under the circumstances, it was reasonable for the Commission to infer that other economic effects, including property taxes based on the value of the generating station, likely accounted for "only a fraction" compared to the entire project, somewhere near that range of percentages. The Commission proceeded on those generalizations in the absence of a more refined estimate.

Based on the evidence and inferences reasonably drawn from the evidence, a reasoning mind could conclude, as the Commission did, that "relatively limited . . . monetary benefits" would "accru[e] to Calvert County through . . . longer-term tax payments from the Generating Station." Even though it may have been possible for the Commission to improve those general estimates by obtaining better evidence, the Commission did not require additional testimony before reaching its decision. *See People's Counsel v. Pub. Serv. Comm'n*, 52 Md. App. at 726-27.

As its next challenge, AMP contends that the Commission acted outside of its authority when it incorporated Conditions J-3 and J-4 into its order. Again, our analysis begins with the statutory directive that the Commission's decision is "*prima facie correct* and shall be affirmed unless *clearly shown* to be . . . outside the statutory authority or jurisdiction of the Commission[.]" PUA § 3-203(2) (emphasis added).

As mentioned previously, when Dominion submitted its final brief in support of its application, Dominion agreed to adopt conditions proposed by PPRP and by the Commission's staff. Dominion proposed four additional conditions, including: Condition J-3, a one-time contribution of $400,000 to the Maryland Energy Assistance Program (MEAP); and Condition J-4, an offer to provide "$20.38 million in in-kind contributions and funding" through grants to electric distribution utilities or through a trust to support other greenhouse-gas reduction projects determined by the Commission. The Sierra Club and CCAN similarly proposed that Dominion be required to offset environmental harms by making a "significant investment in carbon-free Maryland-based renewables[.]" The Commission's staff commented that the proposed $20.38 million in funding "would be more appropriately directed" to the State's Strategic Energy Investment Fund (SEIF) so that it would be "allocated specifically to greenhouse gas reduction-related activities."

Assessing these proposals, the Commission determined that it could not grant the certificate unless Dominion agreed to new conditions. The Commission wrote: "In developing additional conditions, we focus on actions that will benefit both the environmental and economic interests of the State by benefiting renewable and clean

energy resources, reducing or mitigating climate change effects, and promoting beneficial changes in generation and electric usage by consumers." Reasoning that Dominion's proposal for services valued at $20.38 million was "insufficient" and "could be more effectively utilized" through a direct monetary contribution, the Commission changed Condition J-4 to require that Dominion contribute a total of $40 million over five years to the SEIF. Citing expected increases in consumer energy prices, the Commission also modified Condition J-3 to require that Dominion contribute $400,000 to MEAP for each of the expected 20 years of the plant's operation, for a total of $8 million. Dominion accepted those conditions.

On appeal, AMP now contends that the Commission "enact[ed] $48 million in taxes" by granting of the certificate subject to direct payments to specialized funds. AMP argues that the Commission lacks power to impose taxes absent explicit authorization from the legislature.[8]

The Commission agrees that it lacks the power to levy taxes. The Commission responds, however, that the payments to MEAP and SEIF are not "taxes" but merely "conditions" that the Commission may impose. The Public Utilities Article not only vests the Commission with "the powers specifically conferred by law," but goes on to

---

[8] Dominion also submitted Condition J-2, which the Commission adopted without modification. Condition J-2 required Dominion to "establish a trust or similar instrument in the amount of $190,000 for the Maryland Geological Survey (MGS)" to monitor land subsidence resulting from the construction. The Maryland Geological Survey, which is part of the Department of Natural Resources, studies and reports on the State's geology, mineral, and water resources. NR § 2-202. AMP has not contended that Condition J-2 constitutes a tax.

state that it also "has the implied and incidental powers needed or proper to carry out its functions[.]" PUA § 2-112(b). Moreover, the Commission's powers are "construed liberally." PUA § 2-112(c). After a hearing on an application pursuant to PUA §§ 7-207 and 7-208, the Commission has the option to "grant the certificate, subject to conditions the Commission determines to be appropriate[.]" PUA § 7-208(f)(1)(ii). The Commission bases that determination of whether to grant, conditionally grant, or deny a certificate on the Commission's consideration of, among other things, "the effect of the generating station" on "economics" and "air and water pollution[.]" PUA § 7-207(e)(2).

Based on these provisions, the Commission argues that it has authority "to condition its approval, as appropriate, to ensure that applicants . . . satisfy the economic and public interest needs of the State." The Commission characterizes the $48 million in contributions as "an adjustment of an amount voluntarily agreed to" by Dominion. The Commission asserts that its modifications of Conditions J-3 and J-4 "raised the contribution amount to near the mid-point of the range of economic risks that the contribution was intended to mitigate" and ensured that the contributions would mitigate economic risks and environmental harms resulting from the project.[9]

The Commission also informs this Court that it commonly imposes economic conditions, including direct payment conditions, in other contexts. A comparable

---

[9] In its brief, Dominion argues that that the Commission acted within its authority by creating "appropriate" conditions that Dominion "voluntarily accepted." As an alternative, Dominion also argues that even if the $48 million of payments are not voluntary, those payments should be regarded as permissible regulatory fees rather than taxes. We do not accept the premise that Dominion "voluntarily accepted" the conditions that the Commission imposed as a prerequisite to regulatory approval.

-29-

provision of the Public Utilities law states that, before the Commission may approve an application for the acquisition of certain regulated public service companies, the Commission must find "that the acquisition is consistent with the public interest, convenience, and necessity, including benefits and no harm to consumers[.]" PUA § 6-105(g)(3)(i). "The Commission may condition an order authorizing the acquisition on the applicant's satisfactory performance or adherence to specific requirements." PUA § 6-105(g)(3)(ii).

The Commission has exercised this power to "condition" the approval of mergers upon direct contributions from companies to consumer investment funds, so as to create the consumer benefits necessary for approval. *See In re Merger of Exelon Corp. & Constellation Energy Grp., Inc.*, 103 Md. P.S.C. 22 (2012) (conditioning approval of merger on company's investment of "$113.5 million, over a three-year period, into a Customer Investment Fund for the purpose of providing energy efficiency and low-income energy assistance to [energy] customers"). The appellees argue that the conditions imposed upon Dominion are "no different" from conditions imposed in other cases, but they identify no case in which the Maryland courts have passed upon the propriety of this practice.

Additionally, both the Commission and Dominion urge this Court not to address the issue of whether the conditions imposed by the order exceeded the Commission's authority, on the theory that AMP lacks "standing" to challenge the imposition of a "tax" to be paid by Dominion. The Commission denies that AMP has standing in a single sentence of its brief, in which, without any elaboration, it cites two inapposite cases

-30-

involving a taxpayer's right to challenge the constitutionality of a tax. Dominion advances no argument in support of its assertion that AMP lacks standing to raise this particular challenge.

These vague and unsupported allusions to doctrines of taxpayer standing are inapt, because AMP has never claimed that its standing in the judicial review action derives from its status as a taxpayer. As AMP correctly asserts, its standing to challenge the overall lawfulness of the order derives from PUA § 3-202, which authorizes "a party . . . that is dissatisfied by a final decision or order of the Commission" to seek judicial review. *See Mid-Atlantic Power Supply Ass'n v. Pub. Serv. Comm'n of Maryland*, 361 Md. 196, 206-07 (2000) (holding that this requirement of dissatisfaction with an order or decision is met when a party to the proceeding seeks judicial review, proffering reasons for reversal). Without question, AMP was a party to the proceeding and is "dissatisfied by" the Commission's "final decision" to authorize construction of the generating station. To meet the statute's threshold for challenging the lawfulness of the order, AMP does not need to show that it was also aggrieved by the Commission's subsidiary decisions to require Dominion to pay sums of money. AMP is a proper party to raise a contention that conditions essential to that ultimate decision were unlawful.

The decisive issue here is whether the Commission's decision to condition its approval of the certificate upon payments totaling $48 million to two funds administered by the State amounts to the imposition of a tax. The Court of Appeals has used a variety of general formulations to define a tax under Maryland law:

Th[e] Court long ago defined the statutory term "taxes" to mean "burdens, charges or impositions, put or set upon persons of property for public uses . . . ." *Mayor and City Council of Baltimore v. Greenmount Cemetery*, 7 Md. 517, 535 (1855). Later th[e] Court defined "tax" as "a charge imposed upon the taxpayer as an act of sovereignty, without his consent, and for the public use . . . ." *Baltimore v. Fine*, 148 Md. 324, 328 [] (1925) . . . .

*Workmen's Comp. Comm'n v. Prop. & Cas. Ins. Guar. Corp.*, 319 Md. 1, 5 (1990); *see also Eastern Diversified Props., Inc. v. Montgomery Cnty.*, 319 Md. 45, 54 (1990) (noting that the Supreme Court has defined a "tax" as "'an enforced contribution to provide for the support of [the] government,'" and other courts "have generally defined taxes as 'taking money from the taxpayer for public purposes'") (quoting *United States v. State of Maryland*, 471 F. Supp. 1030, 1036 (D. Md. 1979)) (further citations omitted).

In determining whether a particular governmental charge is a tax, "the purpose of the enactment governs rather than the legislative label." *Campbell v. Mayor & Aldermen of City of Annapolis*, 289 Md. 300, 305 (1981) (citing *Maryland Theatrical Corp. v. Brennan*, 180 Md. 377, 381-82 (1942)). A variety of charges, although labeled as something other than a tax and directed to specialized funds rather than a general treasury, may be taxes nonetheless. *E.g. Eastern Diversified*, 319 Md. at 52-55 ("development impact fee" imposed by Montgomery County as condition for approving building permit and deposited in a restricted account for specific road improvements); *Workmen's Comp. Comm'n v. Prop. & Cas. Ins. Guar. Corp.*, 319 Md. at 5-8 ("assessments" based on percentages of workers' compensation awards and settlements and contributed to Subsequent Injury Fund and Uninsured Employers' Fund); *Brennan*, 180 Md. at 380-82 ("license or permit fee" on public dances in Baltimore City collected

for benefit of special fund of board of police commissioners); *see also United States v. State of Maryland*, 471 F. Supp. at 1035-36 ("environmental surcharge" per kilowatt hour of electric energy to finance ecological, biological, and environmental studies through Environmental Trust Fund).

It is beyond dispute that contributions to MEAP and SEIF will benefit the public. Both programs operate under statutory mandates to serve defined public purposes. MEAP, a program established under the purview of the Department of Human Services, makes payments on behalf of low-income households to defray fuel and utility costs. *See* Md. Code (2007, 2014 Supp.), § 5-5A-07(b) of the Human Services Article. SEIF, which is administered by the Maryland Energy Administration, expends its funds on a range of programs, including investments in energy efficiency and conservation programs, renewable and clean energy resources, programs to reduce or mitigate the effects of climate change, and demand response programs to promote changes in electric usage. *See* SG § 9-20B-05.[10] As the Commission's order recognized, Dominion's contributions to these funds will "benefit both the environmental and economic interests of the State[.]"

Both the Commission and Dominion attempt to characterize the $48 million in payments as "voluntary contributions" to those State programs. They emphasize that Dominion, which had originally proposed Conditions J-3 and J-4, accepted the modified

---

[10] The Commission ordered that the contributions to SEIF "shall be used solely for the purpose of investing in the promotion, development, and implementation of one or more of the following categories: (1) renewable and clean energy resources; (2) greenhouse gas reduction or mitigation programs; (3) cost-effective energy efficiency and conservation programs, projects, or activities; or (4) demand response programs that are designed to produce changes in electricity usage by consumers."

conditions even after the Commission more than doubled the contribution amount.

The appellees' arguments on this point misconstrue the "involuntariness" component of the legal definition of a tax. Although the Court has described taxes as "involuntary charges" (*Workmen's Comp. Comm'n v. Prop. & Cas. Ins. Guar. Corp.*, 319 Md. at 6), the Court has also used that description interchangeably with the phrase "legally required payments to be expended for public purposes[.]" *Id.*; *see also Eastern Diversified*, 319 Md. at 54 (describing a tax as "'an enforced contribution'") (quoting *United States v. State of Maryland*, 471 F. Supp. at 1036). The appellees point to nothing in Maryland case law that establishes that the legal test for whether a government action constitutes a tax includes an inquiry into a party's subjective willingness to comply. The exaction here is sufficiently compulsory because the Commission granted permission to construct the power plant upon the requirement that Dominion make the payments. *See Eastern Diversified*, 319 Md. at 47 (county imposed tax when local agency, in accordance with county code, conditioned approval of building permit upon payment of development impact fee). Under the Commission's order, Dominion has a continuing obligation to pay not because it consented, but because the Commission refused to permit construction unless Dominion complied with the payment conditions.

As AMP concedes, however, not every mandatory payment that results in public revenue is a tax. "Historically, for some purposes, cases have recognized a distinction between governmental charges that are essentially revenue-raising and those that are primarily part of a regulatory scheme." *Campbell*, 289 Md. at 304-05. The defining characteristic of a tax is not simply that the charge results in government revenue, but that

revenue is its primary purpose. *See Eastern Diversified*, 319 Md. at 55 (reasoning that

development impact fee was a tax because its "primary and predominant purpose . . . is to

raise revenue, regardless of what incidental regulatory effect the imposition of fees may

have"); *Campbell*, 289 Md. at 305 (explaining that determination of whether charge is a

tax often depends on whether it "is primarily revenue-raising or primarily for a regulatory

purpose"); *Montgomery Cnty. v. Maryland Soft Drink Ass'n, Inc.*, 281 Md. 116, 135

(1977) (concluding that bills providing for beverage container tax could not be deemed

regulatory measures because "the raising of revenue [wa]s their dominant thrust").

AMP's argument focuses upon this distinction between revenue measures and

regulatory measures. AMP points out that the payment conditions imposed by the

Commission are unlike certain regulatory measures that seek to deter or influence

conduct and unlike certain regulatory fees designed to cover expenses of the regulatory

process or to provide services to applicants. At the center of AMP's argument is the

opinion of the Court of Appeals in *Eastern Diversified Properties, Inc. v. Montgomery

Cnty.*, 319 Md. 45 (1990). AMP writes: "The Court of Appeals in *Eastern Diversified*

considered an identical situation and held the payment to be an involuntary exaction, and

*Eastern Diversified* is the controlling law in the present case."[11]

---

[11] *Eastern Diversified* and other cases cited by AMP provide only imperfect
analogies for the instant matter. Those cases address whether a particular legislative
enactment should be regarded as an exercise of the taxing power or the regulatory power.
In the instant case, however, the Commission did not "enact" anything at all. Rather, it
ordered payments in a proceeding pursuant to other regulatory powers delegated to it by
statute. In another context, federal courts have held that, for purposes of the Tax
Injunction Act (28 U.S.C. § 1341), an assessment is less likely to be a tax if it is imposed
by an administrative agency rather than imposed directly by a legislature and collected by

In *Eastern Diversified*, 319 Md. at 46, the Court of Appeals considered whether a "development impact fee" enacted by the Montgomery County Council was a tax. As a charter county, Montgomery County possessed the general power to regulate businesses so as to promote public welfare, but the County lacked general taxing powers. *Id.* at 50-51. The enactment at issue required applicants for building permits to pay a fee based on a formula that accounted for the type and size of structure. *Id.* at 48. The County used the proceeds of the fee to finance highway improvements in designated areas. *Id.* In an administrative proceeding and in an action for judicial review, Eastern Diversified Properties ("Diversified") challenged the County's imposition of the impact fee as a condition for approval of a building permit for Diversified's property. *Id.* at 47-48.

On appeal, Diversified contended that that the "dominant purpose" of the impact fee was to raise revenue and that the County lacked the authority to impose such a tax. *Id.* at 51. Diversified argued that there was "no specific correlation" between the property being developed and the highway improvements financed by the fee, and thus "no assurance that the revenue generated by the fee w[ould] actually be used for the construction of highways claimed to be impacted by the development on Diversified's property." *Id.* Diversified emphasized that the County imposed the fee without even

a general tax assessor (*see Clear Channel Outdoor, Inc. v. Mayor & City Council of Baltimore*, 22 F. Supp. 3d 519, 525 (D. Md. 2014)), and that a charge imposed on a single party or narrow class of parties is less likely to be a tax than one imposed on a broad segment of the population. *See GenOn Mid-Atlantic, LLC v. Montgomery Cnty.*, 650 F.3d 1021, 1024 (4th Cir. 2011). Notwithstanding the uneasy fit between this case and the cases cited by AMP, *Eastern Diversified* illustrates general principles that are helpful in determining whether the Commission's action can accurately be characterized as taxation.

"examin[ing] Diversified's property and its environs to determine, prior to imposing the impact fee, that road construction would be required to accommodate increased traffic as a result of Diversified's proposed use of its property." *Id.* at 51-52. In response, the County asserted that the impact fee was primarily a regulatory measure because the fee had been designed to reflect "'a proportionate share of the additional traffic placed on the road by such development based on a reasonable and rational formula set forth in the County Code.'" *Id.* at 52.

The Court consulted the following criteria to determine whether the impact fee was a tax:

> [W]hether a particular Act is primarily a revenue measure or a regulatory measure is important, because different rules of construction apply. A regulatory measure may produce revenue, but in such a case the amount must be reasonable and have some definite relation to the purpose of the Act. A revenue measure, on the other hand, may also provide for regulation, but if the raising of revenue is the primary purpose, the amount of the tax is not reviewable by the courts. There is no set rule by which it can be determined in which category a particular Act primarily belongs. In general, it may be said that when it appears from the Act itself that revenue is its main objective, and the amount of the tax supports that theory, the enactment is a revenue measure. In general, where the fee is imposed for the purpose of regulation, and the statute requires compliance with certain conditions in addition to the payment of the prescribed sum, such sum is a license proper, imposed by virtue of the police power; but where it is exacted solely for revenue purposes and its payment give[s] the right to carry on the business without any further conditions, it is a tax[.]

*Id.* at 53 (quoting *Brennan*, 180 Md. at 381-82) (internal citations and quotation marks omitted).[12]

---

[12] After the Court of Appeals invalidated the development fee as an improper exercise of general taxing power, Montgomery County enacted legislation that authorized the imposition of the fee under the County's power to impose excise taxes. The Court of

Applying those principles, the Court determined that "the primary and predominant purpose of the enactment of the development impact fee [wa]s to raise revenue, regardless of what incidental regulatory effect the imposition of the fees may have on development within the county." *Eastern Diversified*, 319 Md. at 55. Observing that there were "no further conditions that must be met" to qualify for the permit other than payment of the fee, the Court concluded that the principal purpose of the fee was not to regulate development. *Id.* The Court reiterated that the amount collected by a revenue measure "'must be reasonable and have some definite relation to the purpose of the Act.'" *Id.* (quoting *Brennan*, 180 Md. at 381).

Focusing on this "primary purpose" inquiry, AMP argues that even if "Conditions J-3 and J-4 may incidentally serve a regulatory purpose," the purpose of the conditions was "to provide revenue to the State[.]" Dominion responds that *Eastern Diversified* is distinguishable because, "[h]ere, the Commission's conditions are related to project-specific emissions and potential energy price impacts, with payments targeted to energy-related regulatory programs that would address those emissions and offset any potentially negative effects of energy price increases." In its brief, the Commission emphasizes that it developed the modified Conditions J-3 and J-4 only after evaluating the economic and other risks associated with the project itself.

Ultimately, we are not persuaded by the assertion that the instant case involves an "identical situation" to the one considered in *Eastern Diversified*. A few fundamental

Appeals upheld the fee as an excise tax in *Waters Landing L.P. v. Montgomery Cnty.*, 337 Md. 15 (1994).

characteristics of the Commission's order demonstrate that revenue was only a secondary rather than the primary purpose of the conditions contained in the order.

In *Eastern Diversified*, 319 Md. at 55, the Court inferred that the impact fee primarily served a revenue-generating purpose because a developer did not need to do anything other than pay the prescribed sum to obtain the permit. By contrast, Dominion's payments did not by any means give it "'the right to carry on the business without any further conditions[.]'" *Eastern Diversified*, 319 Md. at 53 (quoting *Brennan*, 180 Md. at 381-82). The Commission's approval of the construction certificate was contingent upon Dominion's acceptance of *all* of the conditions set forth in the appendix, many of which applied throughout the operation of the facility. The 64-page appendix included over 200 separate conditions and requirements regarding other environmental and societal effects. Contrary to AMP's contentions, Conditions J-3 and J-4 are not simply stand-alone measures designed to generate revenue at Dominion's expense. The required payments are part of a unified package of regulatory conditions designed to ensure that, overall, Dominion's project meets the public convenience and necessity standard.

The method by which the Commission determined Dominion's financial contributions indicates that the primary purpose of Conditions J-3 and J-4 was, as stated in the order, to "offset[]" identified societal harms from Dominion's project. The Commission focused on estimates of "the incremental gas cost to Maryland attributable to Cove Point LNG exports" and the loss of "revenues associated with compliance costs" for purchase of greenhouse-gas allowances. By directing the payments to SEIF, which makes investments designed to offset the effects of carbon emissions, and to MEAP,

which makes payments that mitigate the effects of increased energy prices on low-income Maryland residents, the Commission ensured that the payments bore a definite relation to the purposes of PUA § 7-207. Nothing indicates that the Commission considered the financial needs of government programs that would be funded by the contributions. Instead, the process by which the Commission determined the payment amounts and recipients was limited to fact-finding specific to the generating station, in relation to the standards expressed in the statute.

As the Court of Appeals has recognized, "'[t]here is no set rule'" to determine whether the primary purpose of a measure is to generate revenue. *Eastern Diversified*, 319 Md. at 53 (quoting *Brennan*, 180 Md. at 381). *Eastern Diversified* does not, however, extend to the circumstances of this case, where the agency developed the payment conditions in close connection with an extensive list of other regulatory restrictions in an overall effort to mitigate the identified consequences of the particular project that it was approving. The Commission no doubt anticipated that the financial contributions would enhance government revenue, but the principal purpose of Conditions J-3 and J-4 and the hundreds of other conditions imposed by the order was to calibrate the final outcome to address the considerations of PUA § 7-207. Thus, even though the payment conditions from the order share some characteristics of a tax, the overall character of the Commission's action is not indicative of a tax.[13]

---

[13] In its brief, AMP argues only that Conditions J-3 and J-4 are impermissible because the conditions are "taxes." We do not decide whether the payment conditions are permissible as "regulatory fees" as suggested by Dominion. Nor do we reach the Commission's argument that the Commission's power to conditionally approve a

As the final issue in this appeal, AMP contends that the Commission acted arbitrarily and capriciously by considering the positive recommendation of the Board of County Commissioners of Calvert County.

Before taking final action on an application for a certificate of public convenience and necessity, the Commission is required to give "due consideration" to "the recommendation of the governing body of each county or municipal corporation in which any portion of the construction of the generating station . . . is proposed to be located[.]" PUA § 7-207(e)(1). The recommendation of the local governing body is "advisory only and not controlling." *Howard Cnty. v. Potomac Elec. Power Co.*, 319 Md. 511, 526 (1990).

At the public hearing on May 1, 2014, a member of the Board of County Commissioners announced the Board's "unanimous support . . . for th[e] project and for [the] Certificate of Public Convenience and Necessity." The county commissioner stated that the Board had "carefully considered" the matter and had concluded that the project was in the County's best interests. The county commissioner anticipated a "tremendous revenue enhancement," which, he asserted, could be used to fund conservation programs and public education improvements.

On March 25, 2014, the Board sent the Commission a letter signed by all five county commissioners. The letter stated: "We understand that Dominion has submitted

---

certificate or public convenience and necessity includes implicit statutory authorization to impose these direct payment conditions.

an application to construct a 130 [megawatt] electric generating station at its existing [LNG] terminal in Calvert County. Should Dominion be given authority to construct the electric station, please know that [the Board of County Commissioners] fully supports their [certificate of public convenience and necessity] application." The Board expressed confidence that "local impacts" would be minimal, citing the facility's safety record and Dominion's history of working "proactively on preservation and environmental issues[.]"

Before the Commission, AMP argued that the Commission should give either no weight or negative weight to this unanimous support from the local governing body. The Commission rejected that argument, stating: "We decline to go behind or discount those recommendations as requested by AMP."

AMP now contends that the Commission acted arbitrarily or capriciously by "choosing to ignore" evidence regarding the Board's "rationale" for its recommendation. AMP quotes selections from the Board's letter in which the Board expressed support for "LNG exportation" and an "expansion" of the facility. AMP also relies on public comments from the county commissioner, who emphasized economic benefits of the LNG export facility without specifically mentioning the generating station. According to AMP, the Commission acted capriciously when it "refused to examine" evidence that the Board had based its recommendation on support for the overall liquefaction project rather than the generating station.

AMP's argument fails for a number of reasons. First, the statute does not require the Commission to inquire into subjective motives of the local governing body. The Commission must give "due consideration" both to "the recommendation of the [local]

governing body" (PUA § 7-207(e)(1)) and to "the effect of the generating station" on the electric grid, economics, aesthetics, historic sites, aviation, pollution, and waste disposal. PUA § 7-207(e)(2). The Commission's inquiry under paragraph (e)(2) focuses on certain societal effects of the station itself, but paragraph (e)(1) includes no limitation for permissible considerations for the local governing body. Under this scheme, the local government officials may be guided by public opinion and other political considerations, which may be outside the confines of environmental and socioeconomic effects attributable to the power plant. The Commission correctly observed that its proper role was to give due consideration to the preferences of the local elected officials without trying to "go behind" the recommendation to determine whether the Board had sufficiently narrowed its rationale.

AMP's primary complaint seems to be that the Commission's consideration of the Board's recommendation differed from its treatment of other comments and testimony. The Commission discounted many of the public comments opposing the facility, stating: "Consistent with the limited nature of the . . . application filed with us, we cannot give weight to arguments that we should reject the entire LNG project, as that issue is not before us." Similarly, the Commission excluded testimony related to hydraulic fracturing (or "fracking") on the ground that it was outside the scope of the inquiry concerning the generating station. AMP suggests that the Commission should also have discounted the Board's recommendation, as the Board's recommendation was at least partially based on support for the larger LNG project. As we see it, the Commission's distinction was not arbitrary at all, but firmly grounded in the statute. The recommendation of the local

-43-

governing body is a separate consideration that the Commission must weigh (PUA §
7-207(e)(1)), in addition to (not as part of) the Commission's assessments of "the effect
of the generating station[.]"  PUA § 7-207(e)(2).

In any event, even if the Board was required to limit its rationale to specific effects
of the generating station, it was perfectly acceptable for the county commissioners to
mention economic benefits of the overall facility.  As recounted throughout the
Commission's opinion, the generating station and the larger LNG facility were
"integrally related," "overlapping," "intertwined," "interdependen[t]," and "functional[ly]
integrat[ed]."  Just as the Commission considered economic data related to the larger
facility, it was reasonable for the local governing body to do the same.  It would have
been unreasonable to expect the non-expert local body to articulate its rationale with
greater precision than even the PPRP's expert economist, who, quite understandably, had
difficulty separating the economic effects of the power station from the larger facility that
it powered.

Furthermore, even if the Commission was required to scrutinize the rationale for
the Board's recommendation (which it was not), and even if the Board was required to
limit its "rationale" to economic benefits of the generation station (which it was not),
AMP's contention would still fail.  What AMP characterizes as "relevant, competent
evidence" of the Board's allegedly improper rationale was by no means conclusive on
that point.  "The weight to be accorded the kind of evidence presented . . . was for the
Commission to determine." *People's Counsel v. Pub. Serv. Comm'n*, 52 Md. App. at
727.  The Board's letter clearly expressed unanimous support for construction of the "130

[megawatt] electric generating station," and recommended that "Dominion be given authority to construct the electric station." The Commission was "entitled to believe" (*id.*) that the Board meant what it said. When the Board went on to voice its support for the related liquefaction facilities, the Commission could reasonably conclude that the Board supported *both* aspects of Dominion's project. A statement of support for the liquefaction facilities powered by the generating station is by no means inconsistent with an ultimate positive recommendation for the station itself.

In sum, the Commission did not act arbitrarily or capriciously by giving "due consideration" to the Board's recommendation in accordance with PUA § 7-207(e)(1).

<u>CONCLUSION</u>

Because AMP has not clearly shown the Commission's decision to be unconstitutional, unsupported by substantial evidence, outside of the Commission's authority, or arbitrary or capricious, we affirm the judgment of the circuit court, which affirmed the decision of the Commission.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**